UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————

№ 12-CR-432 (JFB)

———————————

UNITED STATES OF AMERICA,

VERSUS

ERIC JACOBSON,

Defendant.

———————————

**MEMORANDUM AND ORDER**
March 13, 2014

———————————

JOSEPH F. BIANCO, District Judge:

On July 3, 2012, a grand jury returned an indictment charging Eric Jacobson ("Jacobson" or "defendant") with one count of conspiracy to distribute a controlled substance (oxycodone) in violation of 21 U.S.C. §§ 846, and five counts of distribution of a controlled substance (oxycodone) in violation of 21 U.S.C. § 841(a)(1). More recently, on February 12, 2014, a grand jury returned a superseding indictment charging defendant with one count of conspiracy to distribute a controlled substance and 261 counts of distribution of a controlled substance.

On December 9, 2013, defendant moved to suppress evidence seized from his medical office on December 1, 2011 and June 5, 2012, arguing that the warrants authorizing the seizures violated the particularity requirement of the Fourth Amendment, and that the search warrants were not promptly returned to the Court, in violation of Federal Rule of Criminal Procedure 41. Defendant also moved to suppress incriminating statements he made to a federal agent while in custody on June 22, 2012. The government opposed the motion to suppress defendant's statements on January 16, 2014, and defendant replied on January 30, 2014. The government opposed the motion to suppress evidence on January 30, 2014, and defendant replied on February 10, 2014. The Court conducted an evidentiary hearing on defendant's motion to suppress his statements on February 28, 2014.

For the reasons that follow, the motions to suppress are denied. First, the Court concludes that the two warrants authorizing the seizure of evidence from defendant's office were sufficiently particular because they adequately (1) identified the specific offenses for which law enforcement established probable cause, (2) described the place to be searched, and (3) specified the items to be seized by their relation to designated crimes. Contrary to defendant's

position, neither warrant contained an impermissible catch-all provision authorizing the search and seizure of electronic data without limitation. Moreover, under the circumstances of this case, both warrants were sufficiently particular even though they did not contain either a temporal limitation on the items to be seized or a specific list of patient files to be seized. In addition, even assuming *arguendo* that the warrants are invalid, the evidence seized pursuant to those warrants would be admissible under the good faith exception to the exclusionary rule. Finally, concerning defendant's Rule 41 claim, defendant has demonstrated neither prejudice from the government's failure to promptly return the search warrants to the Court, nor evidence of the government's intentional and deliberate disregard of Rule 41. Thus, defendant is not entitled to suppression of the evidence seized pursuant to the two warrants. Second, with respect to the motion to suppress defendant's statements, defendant asserts that his incriminating statements were the product of custodial interrogation conducted in the absence of *Miranda* warnings. However, having conducted a full evidentiary hearing (including an evaluation of the demeanor of the testifying witness), the Court finds defendant's version of events in his affidavit to be wholly incredible and, instead, fully credits the version of events described by the law enforcement agent who testified at the hearing. Based on the evidence adduced at the suppression hearing, the Court finds that defendant volunteered the incriminating statements he seeks to suppress. In other words, the statements at issue were not the product of "interrogation," and, accordingly, the statements are admissible even though law enforcement had not advised defendant of his *Miranda* warnings on the date the statements were made.

I. MOTION TO SUPPRESS EVIDENCE SEIZED PURSUANT TO SEARCH WARRANTS

Defendant contends that all evidence seized pursuant to two search warrants must be suppressed because those search warrants lacked the particularity required by the Fourth Amendment. In addition, defendant argues for suppression on the grounds that the agents who executed those warrants did not promptly return the warrants to the Court, in violation of Federal Rule of Criminal Procedure 41(f)(1)(D). For the following reasons, defendant's motion to suppress the evidence seized during the search is denied.

A. The Search Warrants

1. 2011 Search Warrant

On November 30, 2011, Magistrate Judge Arlene R. Lindsay signed a warrant to search defendant's medical office at 277 Northern Boulevard, Suite 309, Great Neck, New York (the "2011 Warrant"). The government's application for a warrant was supported by the affidavit of Drug Enforcement Agency ("DEA") Special Agent Sabrina Conwell, although the 2011 Warrant itself did not incorporate the affidavit. The 2011 Warrant stated that defendant's medical office was believed to conceal the items enumerated in "Attachment A," which authorized the seizure of the following items:

> 1. Any and all records, data and correspondence constituting evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Section 841(a)(1), in any form wherever that they may be stored or found including, but not limited to:

(a) documents, information or records relating to the prescribing of controlled substances, including but not limited to blank or completed prescriptions, Controlled Substance Information reports and appointment books;

(b) patient records, lists and files and related identifying information for customers who have received prescriptions for controlled substances;

(c) billing and payment records, including but not limited to receipts of payments, checks, checkbooks, credit card records, invoices, shipping documentation, insurance records, ATM records, deposit and withdrawal records, bank statements, tax records, bills, cash receipt books, bookkeeping ledgers for patients/customers who have received prescriptions for controlled substances;

(d) any United States currency which has been paid or given by customers to Dr. Jacobson or any employee or contractor at the SUBJECT OFFICE to secure an appointment or to secure a prescription for a controlled substance;

(e) financial books and records and documents constituting, concerning, or relating to payments made for controlled substance prescriptions;

(f) records concerning use or disposition of cash proceeds obtained for the prescription of controlled substances, including, but not limited to bank account records, credit card records; money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond funds;

(g) contracts, agreements, logs, lists or papers affiliated with any medical professional services rendered at the SUBJECT PREMISES;

(h) All records files and resumes of employees, contractors or other medical personnel working for or seeking work at the SUBJECT OFFICE, including, but not limited to, any handwritten or computer files listing names addresses, telephone numbers and background information for any and all current and former employees, contractors or other medical personnel working for or seeking work at the SUBJECT PREMISES or for Dr. Jacobson;

(i) documents demonstrating the rental or ownership of SUBJECT OFFICE; and

(j) computers, central processing units, external and internal drives, external and internal digital storage equipment or media, computer software,

computerized digital data storage devices, including data stored on hard disks, floppy disks, or CD/DVD Disks, computerized printouts or computer programs, computer or data processing software or data, and any other items which could contain or be used to transmit or store any digital records, documents, and materials described above.

(2011 Warrant, Attachment A ¶ 1.) Paragraph two of Attachment A states that "[a]gents searching for the items described above are authorized to search any computers or digital media at the SUBJECT OFFICE and to copy all data stored on such computer(s) or media in order to extract and examine the above-described information." (*Id.* ¶ 2.)

DEA and Internal Revenue Service ("IRS") agents executed the 2011 Warrant on December 1, 2011 at 11:30 a.m. (2011 Warrant Return.) Agents recovered patient folders, images of a four gigabyte thumb drive and two computers, a computer, and "misc[ellaneous] documents." (*Id.*) The agents left a copy of the warrant and an inventory of items seized with office staff at the reception desk. (*Id.*) They filed the search warrant return with the Court on December 2, 2013. (*Id.*)

### 2. 2012 Search Warrant

Approximately six months later, on June 4, 2012, Magistrate Judge William D. Wall signed a second warrant to search defendant's medical office at 277 Northern Boulevard, Suite 309, Great Neck, New York (the "2012 Warrant"). The government's application for a warrant was supported by the affidavit of IRS Special Agent Gerard J. Ricciardi, although the 2012 Warrant itself did not incorporate the affidavit. The 2012 Warrant stated that defendant's medical office was believed to conceal the items enumerated in "Attachment A," which authorized the seizure of the following items:

> 1. Any and all records, data and correspondence constituting evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846, in any form wherever that they may be stored or found including, but not limited to:
>
> [subsections (a) through (j), which are identical to sections (a) through (j) in the 2011 Warrant]

(2012 Warrant, Attachment A ¶ 1.) Like the 2011 Warrant, Attachment A to the 2012 Warrant also states that "[a]gents searching for the items described above are authorized to search any computers or digital media at the SUBJECT OFFICE and to copy all data stored on such computer(s) or media in order to extract and examine the above-described information." (*Id.* ¶ 2.)

DEA and IRS agents executed the 2012 Warrant on June 5, 2012 at 3:00 p.m. (2012 Warrant Return.) Agents recovered two laptop computers; three tower computers; approximately all patient files in the reception area, exam rooms, and defendant's office; one briefcase containing patient information; patient ledger books; payment ledger books; blank prescription pads; and blank prescription sheets for a printer. (*Id.*) The agents left a copy of the warrant and an inventory of items seized with office staff at the reception desk. (*Id.*) They filed the search warrant return with the Court on December 2, 2013. (*Id.*)

4

B. Admissibility of Evidence Seized
Pursuant to the 2011 and 2012 Warrants

1. Legal Standards

a. Fourth Amendment Particularity

The Warrants Clause of the Fourth Amendment of the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath of affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. "The Fourth Amendment was a response to the English Crown's use of general warrants, which often allowed royal officials to search and seize whatever and whomever they pleased while investigating crimes or affronts to the Crown." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2084 (2011). "To achieve its goal, the Warrants Clause requires particularity and forbids overbreadth." *United States v. Cioffi*, 668 F. Supp. 2d 385, 390 (E.D.N.Y. 2009). "'Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited to the probable cause on which the warrant is based.'" *Id.* (quoting *United States v. Hill*, 459 F.3d 966, 973 (9th Cir. 2006)); *see, e.g.*, *United States v. Hernandez*, No. 09-CR-625 (HB), 2010 WL 26544, at *7 (S.D.N.Y. Jan. 6, 2010) ("Although somewhat similar in focus, [overbreadth and particularity] are two distinct legal issues: (1) whether the items listed as 'to be seized' in the warrant were overbroad because they lacked probable cause and (2) whether the warrant was sufficiently particularized on its face to provide the necessary guidelines for the search by the executing officers.").[1]

The Second Circuit recently identified "three components" to the particularity requirement. *See United States v. Galpin*, 720 F.3d 436, 445 (2d Cir. 2013). "First, a warrant must identify the specific offense for which the police have established probable cause." *Id.*; *see, e.g.*, *United States v. George*, 975 F.2d 72, 76 (2d Cir. 1992) (warrant was insufficiently particular where it authorized officers to search for "any other evidence relating to the commission of a crime"). "Second, a warrant must describe the place to be searched." *Galpin*, 720 F.3d at 445–46. "Third, the warrant must specify the 'items to be seized by their relation to designated crimes.'" *Id.* at 446 (quoting *United States v. Williams*, 592 F.3d 511, 519 (4th Cir. 2010)); *see, e.g.*, *United States v. Buck*, 813 F.2d 588, 590–92 (2d Cir. 1987) (warrant was insufficiently particular where it authorized seizure of "any papers, things or property of any kind relating to previously described crime").

Ultimately, "[a] warrant is sufficiently particular if it 'enable[s] the executing officer to ascertain and identify with reasonable certainty those items that the magistrate has authorized him to seize.'" *Cioffi*, 668 F. Supp. 2d at 390 (quoting *George*, 975 F.2d at 75); *see also United States v. Liu*, 239 F.3d 138, 140 (2d Cir. 2000) ("A warrant must be 'sufficiently specific to permit the rational exercise of judgment [by the executing officers] in selecting what items to seize.'" (quoting *United States v. LaChance*, 788 F.2d 856, 874 (2d Cir. 1986)) (brackets in original)). "The level of specificity required by the Fourth Amendment depends on many factors. The nature of the crime, for example, may require a broad search." *United States v. Dupree*, 781 F. Supp. 2d 115, 149 (E.D.N.Y. 2011). "'Courts tend to tolerate a greater degree of ambiguity where law enforcement

---

[1] In the instant motion, defendant argues only that the 2011 and 2012 Warrants lacked particularity, not that they were overbroad. Accordingly, the Court sets forth the law on particularity, but not overbreadth.

5

agents have done the best that could reasonably be expected under the circumstances, have acquired all the descriptive facts which a reasonable investigation could be expected to cover, and have insured that all those facts were included in the warrant.'" *Buck*, 813 F.2d at 590 (quoting *United States v. Young*, 745 F.2d 733, 759 (2d Cir. 1984)); *see also Cioffi*, 668 F. Supp. 2d at 391.

### b. Good Faith Exception to the Exclusionary Rule

Even if a warrant lacks particularity in violation of the Fourth Amendment, "[t]he fact that a Fourth Amendment violation occurred . . . does not necessarily mean that the exclusionary rule applies." *Herring v. United States*, 555 U.S. 135, 140 (2009). In fact, the Supreme Court has explained that application of the exclusionary rule has always been its "last resort," not its "first impulse." *Id.* "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Id.* at 144.

Under the good faith rule set forth in *United States v. Leon*, the exclusionary rule does not apply to "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant." 468 U.S. 897, 922 (1984); *see, e.g.*, *Galpin*, 720 F.3d at 452. "'The burden is on the government to demonstrate the objective reasonableness of the officers' good faith reliance' on an invalidated warrant." *United States v. Clark*, 638 F.3d 89, 100 (2d Cir. 2011) (quoting *George*, 975 F.2d at 77). "In assessing whether it has carried that burden," courts must be "mindful that, in *Leon*, the Supreme Court strongly signaled that most searches conducted pursuant to a warrant would likely fall within its protection." *Id.*; *see Leon*, 468 U.S. at 922 ("Searches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." (internal citations and quotation marks omitted)). Thus, "[m]ost searches will be upheld." *United States v. Rickard*, 534 F. App'x 35, 37 (2d Cir. 2013). As the Second Circuit has explained:

> It was against this presumption of reasonableness that the Supreme Court identified four circumstances where an exception to the exclusionary rule would not apply:
>
> "(1) where the issuing magistrate has been knowingly misled; (2) where the issuing magistrate wholly abandoned his or her judicial role; (3) where the application is so lacking in indicia of probable cause as to render reliance upon it unreasonable; and (4) where the warrant is so facially deficient that reliance upon it is unreasonable."

*Clark*, 638 F.3d at 100 (quoting *United States v. Moore*, 968 F.2d 216, 222 (2d Cir. 1992)); *see Leon*, 468 U.S. at 923; *Galpin*, 720 F.3d at 452.

### c. Federal Rule of Criminal Procedure 41

Federal Rule of Criminal Procedure 41 "governs the practice of issuing federal search warrants." *United States v. Kone*, 591 F. Supp. 2d 593, 608 (S.D.N.Y. 2008). Specifically, Rule 41(f)(1)(D) applies to the return of a warrant, and provides as follows:

6

> The officer executing the warrant must promptly return it—together with a copy of the inventory—to the magistrate judge designated on the warrant. The officer may do so by reliable electronic means. The judge must, on request, give a copy of the inventory to the person from whom, or from whose premises, the property was taken and to the applicant for the warrant.

Even where government officials violate the requirements of Rule 41, courts "must be 'wary in extending the exclusionary rule in search and seizure cases to violations' of Rule 41 alone." *United States v. Turner*, 558 F.2d 46, 52 (2d Cir. 1977) (quoting *United States v. Burke*, 517 F.2d 377, 386 (2d Cir. 1975)). Instead, the Second Circuit held in *Burke* that "violations of Rule 41 alone should not lead to exclusion unless (1) there was 'prejudice' in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule." 517 F.2d at 386–87. "'Prejudice' in this context consists of being subjected to a search that '(1) might not have occurred or (2) would not have been so abrasive if the Rule had been followed.'" *Turner*, 558 F.2d at 52 (quoting *Burke*, 517 F.2d at 387); *see also United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir. 1993).

2. Application

Because the 2011 and 2012 Warrants are nearly identical in all respects relevant to the instant motion, the Court considers them in tandem.

a. Particularity

Defendant acknowledges that the 2011 and 2012 Warrants adequately identified specific offenses and described with particularity the place to be searched. However, he contends that the 2011 and 2012 Warrants lacked particularity because they included impermissibly broad catch-all paragraphs, they did not contain any temporal limitation, and they did not identify specific patient files to be seized. After considering these objections and examining the warrants under the foregoing legal standards, the Court concludes that the 2011 and 2012 Warrants complied with the Fourth Amendment's particularity requirement.[2]

Most significantly, contrary to defendant's argument, the warrants at issue did not authorize "search teams to peruse 'any computers' and to copy 'all data' stored on them." (Def.'s Reply Mem. at 3 (quoting 2011 Warrant, Attachment A ¶ 2; 2012 Warrant, Attachment A ¶ 2); *see also* Def.'s Mem. at 3.) Defendant's selective quotation of Attachment A makes it appear as if the 2011 and 2012 Warrants authorized the search of any computers or digital media,

---

[2] In reaching this conclusion, the Court has not relied on the affidavits submitted in support of the 2011 and 2012 Warrants, which were not incorporated into the warrants themselves. *See, e.g.*, *United States v. Rosa*, 626 F.3d 56, 64 (2d Cir. 2010) (holding that courts "may no longer rely on unincorporated, unattached supporting documents to cure an otherwise defective search warrant"); *United States v. Cohan*, 628 F. Supp. 2d 355, 364 n.4 (E.D.N.Y. 2009) ("[B]ecause particularity deals with the extent to which the executing officer's discretion is cabined, the relevant perspective for that analysis is that of those at the scene of the search, who do not have meaningful access to the affidavit unless it is incorporated and attached . . . ." (citing *Groh v. Ramirez*, 540 U.S. 551, 557 (2004); *Marron v. United States*, 275 U.S. 192, 196 (1927))).

without limitation. However, defendant mischaracterizes the scope of this authorization. In both warrants, paragraph two of Attachment A provided that "[a]gents *searching for the items described above* are authorized to search any computers or digital media at the SUBJECT OFFICE and to copy all data stored on such computer(s) or media *in order to extract and examine the above-described information*." (2011 Warrant, Attachment A ¶ 2; 2012 Warrant, Attachment A ¶ 2 (emphasis added).) Thus, paragraph two of Attachment A was not the catch-all provision that defendant describes it to be; paragraph two authorized the search of computers or digital media only within the limitations detailed in paragraph one.

Moreover, paragraph one set forth sufficient limitations on the items to be seized. As noted, paragraph one authorized the seizure of "evidence, fruits and instrumentalities" of particular federal crimes,[3] and also enumerated ten illustrative categories of items in subsections (a) through (j). (*See* 2011 Warrant, Attachment A ¶ 1; 2012 Warrant, Attachment A ¶ 1.) The reference to particular offenses and the use of an illustrative list of items to seize sufficiently particularized the warrants. *See, e.g.*, *United States v. Riley*, 906 F.2d 841, 844–45 (2d Cir. 1990). For instance, in *Riley*, the Second Circuit held that a warrant authorizing the seizure of the following items was sufficiently particular: "records of the distribution of cocaine . . . including but not limited to, bank records, brokerage house records, business records, safety deposit box keys or records and other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same." *Id.* at 843. The Second Circuit held that the "illustrative list of seizable items" satisfied the Fourth Amendment's particularity requirement, notwithstanding the warrant's reference to "other items that constitute evidence of the offenses of conspiracy to distribute controlled substances and distribution of the same." *Id.* at 844–45. "Here, as in *Riley*, the warrant[s] listed various examples of the items to be seized," and "identified a specific illegal activity tied to the items that the Court authorized for seizure." *United States v. Bonczek*, No. 08-CR-361 (PAC), 2008 WL 4615853, at *12 (S.D.N.Y. Oct. 16, 2008), *aff'd*, 391 F. App'x 21 (2d Cir. 2010). In doing so, the warrants both identified the specific offenses for which law enforcement established probable cause, and specified the items to be seized by their relation to designated crimes. *See Galpin*, 720 F.3d at 445–46 (describing components of particularity).

Because the 2011 and 2012 Warrants referenced particular crimes and used illustrative lists as a means of limiting the items to be seized, they differ significantly from the warrant at issue in *United States v. Zemlyansky*, the principal decision upon which defendant relies. *See* 945 F. Supp. 2d 438, 454 (S.D.N.Y. 2013). In *Zemlyansky*, the court held that a warrant failed the particularity requirement where the warrant did not provide "any indication of the relevant criminal allegations" and allowed for the seizure of broad categories of materials "without indicating any individuals, entities, offenses, time frame, or relevance." *Id.* at 454, 457. For example, "the warrant indiscriminately permit[ted] the

---

[3] As noted *supra*, the 2011 Warrant authorized the seizure of "evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1956 and 1957, and Title 21, United States Code, Section 841(a)(1)." (2011 Warrant, Attachment A ¶ 1.) The 2012 Warrant authorized the seizure of "evidence, fruits and instrumentalities of violations of Title 21, United States Code, Section 846." (2012 Warrant, Attachment A ¶ 1.)

search of all 'Computers' and 'Thumb drives.'" *Id.* at 458.[4] Thus, the court concluded that, "[a]t bottom, missing from all of these categories—and from the warrant in general—are any instructions to the officers to search for and seize records related to the five modality clinics at the center of the alleged conspiracy in question, related to particular suspects in the case, limited to the time period of the suspected conspiracy, related to the crimes alleged, or any other limits." *Id.* at 459.[5] By contrast, the 2011 and 2012 Warrants are free from such defects.[6]

Instead, the 2011 and 2012 Warrants more closely resemble the warrants upheld in *Hernandez* and *United States v. Levy*. In *Hernandez*, the court concluded that a warrant was sufficiently particular because it "indicate[d] that only documents related to violations of various criminal fraud statutes related to identity, mail, and tax fraud" could be seized. 2010 WL 26544, at *10. Likewise, in *Levy*, the court held that a warrant authorizing the seizure of "[e]vidence, fruits, and instrumentalities of violations of Title 18, United States Code, Sections 1343 (Wire Fraud), 1349 (Conspiracy to Commit Wire Fraud), and 1956 and 1957 (Money Laundering)," followed by an illustrative list of items including business records, computers, and "electronic data storage devices," was sufficiently particular. No. S5 11-CR-62 (PAC), 2013 WL 664712, at *2–3 (S.D.N.Y. Feb. 25, 2013). Although both *Hernandez* and *Levy* noted that certain categories of items to be seized were "'somewhat vague,'" they determined that those categories were sufficiently particular "'given the complexity of [the alleged] scheme and the numerous documents involved.'" *Id.* at *9 (quoting *Hernandez*, 2010 WL 26544, at *10) (alteration in original).[7] Similarly, in the instant case, the complexity and scope of defendant's alleged crimes justified the broad nature of the warrants at issue.

Moreover, under the circumstances of this case, the Court does not find the lack of

---

[4] Specifically, the warrant at issue in *Zemlyansky* enumerated "eight categories of 'Items to be Searched For and Seized,' including bank account information, ledgers documenting patient medical treatment, computers, signature stamps, calendars and other patient appointment records, and financial instruments . . . without a single word of guidance regarding the type of criminal offense under investigation." 945 F. Supp. 2d at 454. Only in one subsection of the ninth category of items to be seized did the warrant relate the items to be seized to specific federal crimes, but this reference imposed no limitation on the other categories of items to be searched for and seized. *See id.*

[5] The defective warrant considered in *Zemlyansky* is thus similar to the warrant described in *United States v. Vilar*, which failed the particularity requirement both because it did not identify any offenses under investigation, and because it included an unlimited catch-all provision. No. S3 05-CR-621 (KMK), 2007 WL 1075041, at *23 (S.D.N.Y. 2007). In discussing the problem with the catch-all provision, *Vilar* observed that "nowhere is this catch-all provision in any way circumscribed, a problem that is amplified by the fact that *other paragraphs in the Warrant do contain limitations—for example, to documents related to the fraud schemes (paragraph 16)*." *Id.* (emphasis added). The 2011 and 2012 Warrants were so limited, and thus do not suffer from the defect identified in *Vilar*.

[6] The 2011 and 2012 Warrants also stand in contrast to the warrant discussed in *Rosa*, which the Second Circuit described as "defective in failing to link the items to be searched and seized to the suspected criminal activity—i.e., any and all electronic equipment potentially used in connection with the production or storage of child pornography and any and all digital files and images relating to child pornography contained therein—and thereby lacked meaningful parameters on an otherwise limitless search." 626 F.3d at 62.

[7] Indeed, the *Zemlyansky* decision explicitly distinguished *Hernandez* and *Levy* on the basis that the warrants at issue in those cases referred to specific criminal offenses that "covered the entire search warrant," and "the warrant plainly indicated that the evidence to be seized had to relate to those crimes." 945 F. Supp. 2d at 456 (describing and distinguishing *Hernandez* and *Levy*).

any temporal limitation in the 2011 and 2012 Warrants to be dispositive. Although a warrant's failure to include a temporal limitation on the things to be seized may, in certain circumstances, render a warrant insufficiently particular, there is no consensus in this Circuit "as to when one is required." *Cohan*, 628 F. Supp. 2d at 366; *see, e.g.*, *United States v. Triumph Capital Grp., Inc.*, 211 F.R.D. 31, 58 (D. Conn. 2002) ("A temporal limitation in a warrant is not an absolute necessity, but is only one indicia of particularity."). As the *Hernandez* decision noted, "[t]he complexity and duration of the alleged criminal activities render a time frame less significant than in a case that required a search for a small set of discrete items related to one or only a few dates." 2010 WL 26544, at *11. Here, as in *Hernandez*, the crimes under investigation were complex and concerned a long period of time, not simply one or two dates of criminal activity. Thus, in this case, the absence of a time frame did not render the otherwise particularized warrants unconstitutionally general. *See id.*

Finally, the 2011 and 2012 Warrants satisfied the particularity requirement even though they did not identify specific patient files to be seized. Although there is no controlling Second Circuit law on this issue, courts outside this Circuit have upheld the constitutionality of warrants that authorized the search of a medical office for all patient files, so long as the warrants were otherwise particular. *See, e.g.*, *United States v. Hayes*, 794 F.2d 1348, 1355 (9th Cir. 1986) (holding that a warrant authorizing the search of a medical office for all patient files was sufficiently particular because "the officers were limited in their seizure to documents dealing with the distribution of controlled substances"); *United States v. Lievertz*, 247 F. Supp. 2d 1052, 1062 (S.D. Ind. 2002). *But see United States v. Wright*, No. 3:10-CR-161, 2012 WL 3778986, at *9 (E.D. Tenn. June 19, 2012) ("In order to satisfy the Fourth Amendment's particularity requirement with regard to the seizure of medical records, the government must identify by patient name, which records are sought." (citing *United States v. Lazar*, 604 F.3d 230, 238 (6th Cir. 2009))), *report & recommendation adopted*, 2012 WL 3778982 (E.D. Tenn. Aug. 30, 2012).[8] Here, the Court agrees with *Hayes* and concludes that the warrants at issue here were sufficiently particular even in the absence of any reference to specific patient files. Specifically, the warrants were otherwise particular by including, as in *Hayes*, a limitation related to enumerated offenses. Moreover, even if the lack of a specific limitation on the patient files to be seized did violate the particularity requirement, the Court concludes *infra* that the good faith exception to the exclusionary rule applies in this circumstance.

For the foregoing reasons, the Court concludes that the 2011 and 2012 Warrants satisfy the Fourth Amendment's particularity requirement because they sufficiently (1) identify the specific offenses for which the police have established probable cause, (2) describe the place to be searched, and (3) specify the items to be seized by their relation to designated crimes. *Galpin*, 720 F.3d at 445–46.

---

[8] Defendant does not argue that the 2011 and 2012 Warrants were overbroad, *i.e.*, that they authorized the seizure of certain patient files without probable cause. *Cf. United States v. Durante*, No. CRIM.A. 11-277 (SRC), 2011 WL 6372775, at *3 (D.N.J. Dec. 20, 2011) ("As to the medical records, Defendant contends that the evidence submitted to establish probable cause did not justify a search of all medical records of all patients in the practice.").

b. Good Faith

Even assuming *arguendo* that the 2011 and 2012 Warrants were not sufficiently particular, the Court concludes that the good faith exception to the exclusionary rule applies in this case. As noted *supra*, "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." *Leon*, 468 U.S. at 922. Under this standard, "[m]ost searches will be upheld." *Rickard*, 534 F. App'x at 37. Nonetheless, defendant contends that the good faith exception does not apply because the 2011 and 2012 Warrants were "so facially deficient that reliance upon [them was] unreasonable." *Galpin*, 720 F.3d at 452; *Clark*, 638 F.3d at 100; *Moore*, 968 F.2d at 222; *see Leon*, 468 U.S. at 923.[9]

This Court disagrees. Defendant's argument is premised on the assertion that paragraph two of Attachment A was an impermissible catch-all paragraph. *See, e.g.*, *Zemlyansky*, 945 F. Supp. 2d at 472 (holding that good faith rule did not apply because "[i]t was clearly established that a warrant which fails to specify the crimes for which the search was being undertaken lacks particularity," and "that a warrant with unduly broad, ambiguous, or catch-all categories lacks particularity."). However, the Court has already explained how paragraph one of Attachment A sufficiently limited paragraph two's scope. Moreover, as to the particularity of paragraph one, a search warrant "cannot be said to be 'so facially deficient' as to preclude reasonable reliance where it expressly provided that the officers were authorized to seize" only evidence, fruits, and instrumentalities of specifically enumerated offenses. *Levy*, 2013 WL 664712, at *10. Accordingly, even if paragraph one were insufficiently particular, it was not so facially deficient as to preclude the application of the good faith rule.

Nor does the absence of any time limitation in the warrants render the evidence seized pursuant to those warrants inadmissible. Indeed, "the fact that the precise relevance of the absence of an express time frame on the particularity and breadth of [a] warrant has yet to be settled in this Circuit further supports the idea that agents reasonably relied on the magistrate's authorization and should be protected by the 'good faith' exception." *Hernandez*, 2010 WL 26544, at *12. Likewise, the absence of any controlling law in this Circuit—and a split of authority outside this Circuit—on the requirement to identify specific patient files in a warrant means that the good faith exception applies even if this Court were to determine that the warrants should have identified specific patient files. *Compare Hayes*, 794 F.2d at 1355 (holding that a warrant authorizing the search of a medical office for all patient files was sufficiently particular); *Lievertz*, 247 F. Supp. 2d at 1062 (same); *with Lazar*, 604 F.3d at 238 (holding that patient files not specifically identified in warrant must be suppressed).

In sum, the Court concludes that the 2011 and 2012 Warrants were not so facially deficient that reliance upon them was unreasonable. The good faith exception thus applies even assuming *arguendo* that the

---

[9] Defendant does not argue that the issuing magistrates were knowingly misled, that the issuing magistrates wholly abandoned their judicial roles, or that the applications for the warrants at issue were so lacking in probable cause that reliance upon them would be unreasonable. *See, e.g.*, *Clark*, 638 F.3d at 100 (explaining other circumstances under which good faith exception does not apply). In any event, there is no basis in this case for disregarding the good faith rule on these grounds.

2011 and 2012 Warrants violated the Fourth Amendment.

### c. Rule 41

Finally, defendant argues for suppression of evidence on the grounds that the agents who executed the 2011 and 2012 Warrants did not return the warrants to the Court until December 2, 2013. As defendant notes, agents filed the return for the 2011 Warrant approximately two years after executing it, and they filed the return for the 2012 Warrant approximately one and one-half years after executing it. The government does not argue that the warrants were "promptly return[ed]," as Rule 41(f)(1)(D) requires. Instead, the government contends only that the failure to "promptly return" the warrants does not justify suppression in this case.

The Court agrees with the government. Defendant has offered no evidence that he suffered prejudice from the violation of Rule 41, or that agents violated Rule 41 intentionally and with deliberate disregard. *See, e.g.*, *United States v. Huggins*, No. 13-CR-00155 (SHS)(SN), 2013 WL 1728269, at *5 (S.D.N.Y. Mar. 22, 2013) (holding that violation of Rule 41 did not warrant suppression where "Oraco has offered no evidence showing it was prejudiced by the Rule's violation or that there was any intentional or deliberate disregard of the Rule's provisions."), *report & recommendation adopted*, 2013 WL 1736466 (S.D.N.Y. Apr. 11, 2013). With respect to prejudice, "[i]t cannot be seriously maintained that [the searches] would not have occurred if Rule 41 had not been violated," or that the searches would have been less abrasive if the Rule had been followed. *Turner*, 558 F.2d at 52.[10] In addition, any "argument that the officers engaged in intentional and deliberate disregard of the Rule's provisions is nothing more than speculation." *United States v. Allen*, 169 F. App'x 634, 636 (2d Cir. 2006). Accordingly, the Court concludes that the failure to promptly return the 2011 and 2012 Warrants does not require suppression of the evidence seized pursuant to those warrants. *See, e.g.*, *United States v. Dudek*, 530 F.2d 684, 688 (6th Cir. 1976) (noting that the failure to file a prompt return to the court "has been held not to require invalidation of an otherwise properly issued and executed search warrant or the suppression of evidence acquired under it").

* * *

In sum, the Court concludes that there is no basis to suppress the evidence recovered pursuant to the 2011 and 2012 Warrants. Accordingly, defendant's motion to suppress that evidence is denied.

### II. MOTION TO SUPPRESS STATEMENTS

Defendant argues that statements he made to law enforcement agents on June 22, 2012 should be suppressed because the statements were made during custodial interrogation, and law enforcement did not provide defendant with *Miranda* warnings. Because the Court finds that defendant made these statements spontaneously, the Court concludes that the statements are admissible even though law enforcement did not recite the *Miranda* warnings to defendant on the date the statements were made. Defendant's motion to suppress is thus denied.

---

[10] To the extent defendant contends that he suffered prejudice because the warrants were returned just days before motions to suppress were due in this case, the Second Circuit does not recognize this type of prejudice as a basis for excluding evidence under Rule 41. *See Burke*, 517 F.2d at 386–87. In any event, as the government notes, agents left inventories of the items seized at defendant's office, and defendant was provided with copies of all items seized in discovery.

A. Findings of Fact

IRS Special Agent Gerard J. Ricciardi ("SA Ricciardi") testified at the suppression hearing. The government also introduced in evidence eight exhibits, including excerpts from two recorded phone calls between defendant and his wife. After evaluating the credibility of SA Ricciardi and the other evidence offered at the evidentiary hearing, as well as defendant's affidavit dated December 6, 2013, the Court fully credits the testimony of SA Ricciardi, and discredits defendant's contrary assertions about what occurred on June 22, 2012 in his affidavit. *See, e.g.*, *United States v. Noble*, No. 07-CR-284 (RJS), 2008 WL 1990707, at *8 (S.D.N.Y. May 7, 2008). Specifically, the Court makes the following findings of fact.

On June 4, 2012, a criminal complaint was filed in this Court, charging defendant with conspiracy to distribute a Schedule II controlled substance (oxycodone) in violation of 21 U.S.C. § 846, and Magistrate Judge Wall issued a warrant for defendant's arrest. (*See* ECF No. 2.) The next day, federal agents, including SA Ricciardi, arrested defendant at his medical office. (Tr. 13–16; Ex. 2, Report of Investigation, June 7, 2012, at 1. [11]) Upon arresting defendant, SA Ricciardi recited the *Miranda* warnings to defendant by reading from a *Miranda* card. (Tr. 14–15; *see* Ex. 1, Photocopy of Miranda Card.) SA Ricciardi read to defendant all the rights listed on his *Miranda* card, and defendant acknowledged that he understood those rights. (Tr. 15–16.) SA Ricciardi did not ask defendant any questions at that time because he understood that defendant was represented by counsel. (Tr. 16–17.)

The following day, defendant, represented by attorney John Martin ("Martin"), appeared before Magistrate Judge E. Thomas Boyle for arraignment and a bail hearing. (Tr. 17; *see* Ex. 4, Arraignment Tr., June 6, 2012 ("Arraignment Tr.").) During the hearing, Magistrate Judge Boyle informed defendant of his right to remain silent. (Arraignment Tr. 3.) At the conclusion of the hearing, Magistrate Judge Boyle entered an order of detention. (Arraignment Tr. 22; *see* Tr. 17.)

Thereafter, the government and Martin scheduled a reverse proffer meeting for June 22, 2012. (Tr. 18.) The government planned to discuss with defendant the evidence against defendant, in the hopes that such a meeting would "move the case along," and possibly lead to "an early disposition of the case," *i.e.*, a guilty plea. (Tr. 19, 50–51.) June 22, 2012 was a Friday, and the United States Marshals Service had a policy of refusing to produce prisoners for meetings on Fridays. (Tr. 18–19.) Thus, the government and Martin agreed that the United States Attorney's Office would obtain a court order to remove defendant from the Nassau County jail and to bring him to the United States Attorney's Office at the United States Courthouse in Central Islip, New York for the reverse proffer meeting. (Tr. 19.) The government obtained the "take-out order" on June 21, 2012. (*Id.*; *see* Ex. 5, Order, June 21, 2012.)

On June 22, 2012, SA Ricciardi and SA Robert Garcia ("SA Garcia") drove to the Nassau County jail at approximately 11 a.m. (Tr. 22–23.) The two agents entered the reception area of the jail, where SA Ricciardi provided the take-out order to a guard. (Tr. 23.) Then SA Ricciardi proceeded to the

---

[11] "Tr." refers to citations to the transcript of the evidentiary hearing, and "Ex." refers to exhibits admitted during the suppression hearing.

13

holding cells, and guards opened the gate of defendant's cell. (*Id.*) Before SA Ricciardi said a word to defendant, defendant stepped out of his cell, immediately burst into tears, and stated: "I'm sorry, Jerry. Please have mercy on my soul." (Tr. 23–24.) Defendant also added that he was "compassionate." (Tr. 24.) SA Ricciardi told defendant to compose himself, and that he did not want to escort defendant out of the jail while defendant was still in tears. (*Id.*) Defendant attempted to calm himself. (*Id.*) Then SA Ricciardi handcuffed defendant and escorted him from the jail to the rear passenger seat of SA Garcia's car. (Tr. 24–25.) SA Ricciardi sat next to defendant in the back seat behind SA Garcia. (Tr. 25.)

As SA Garcia was pulling out of the jail's parking lot, defendant told the agents that he "wanted to cooperate" and "that he was willing to testify against all of the patients that he had." (*Id.*) SA Ricciardi had not said anything to defendant before defendant made these statements. (*Id.*) In response to defendant's stated willingness to cooperate, SA Ricciardi said: "That's great. That's good. What we'll do is, we're going to go to the courthouse. John Martin will be there. Lara Gatz will be there. And we'll discuss it there. But why don't we just wait until we get to the courthouse." (Tr. 26.)

During the drive to the courthouse, defendant commented on the weather and said that it was nice to be outside. (*Id.*) SA Ricciardi agreed with defendant that it was a nice day, and either SA Ricciardi or SA Garcia opened the car window to let the air blow into the car. (Tr. 26–27.) Defendant proceeded to talk about being in jail, and how he felt that the guards were not treating him like a human being. (Tr. 28.) At that point, defendant broke down and began to beg for SA Ricciardi's forgiveness. (*Id.*) Specifically, defendant attempted to kneel and put his hands together, as if praying, and said: "I'm sorry. Please forgive me for what I did." (Tr. 28–29.) SA Ricciardi told defendant to sit up and not to beg. (Tr. 29.)

Defendant calmed himself and, without any statement or question from SA Ricciardi, started talking about his girlfriend, Nicole Peluso ("Peluso"). (Tr. 29–30.) Specifically, defendant stated, "I took care of Nicole," and added that he prescribed pills for her, helped pay her rent, and helped pay her cell phone bill. (Tr. 30.) Defendant also told SA Ricciardi that he had sex with Peluso because he had not had sex with his wife in approximately three years, that he was "sorry for doing that," and that he knew it was wrong. (Tr. 30–31.) Defendant also revealed that Peluso had been abused by her father and raped by her uncle, and explained that he "took care of her for the pain that she was in." (*Id.*) In addition, defendant volunteered that he was at Peluso's house the night before he was arrested. (Tr. 31.) SA Ricciardi had previously interviewed Peluso, and he was aware of everything that defendant was revealing. (Tr. 31–32.) During the ride from the jail to the courthouse, SA Ricciardi never asked about Peluso. (Tr. 32.) However, in an effort to calm defendant, SA Ricciardi did state the following: "I can see you having, you know, sex with Nicole if you haven't been with your wife for three years." (Tr. 31.)

Upon their arrival at the courthouse, SA Ricciardi and SA Garcia escorted defendant to the United States Attorney's Office, where defendant was given the opportunity to speak privately with Martin and another lawyer, whose name SA Ricciardi does not remember, in a meeting room. (Tr. 32–33.) After ten to fifteen minutes, SA Ricciardi, SA Garcia, and Assistant United States Attorney Lara Gatz ("AUSA Gatz") joined defendant and his attorneys in the meeting room. (Tr. 33–34.) Martin told defendant "not to say a word," and that "no good [could] come" from defendant speaking. (Tr. 34.) AUSA Gatz

reiterated to defendant that he should not say anything, warned defendant that anything he did say would be used against him, and indicated that SA Ricciardi was taking notes. (Tr. 34–35.) Then AUSA Gatz proceeded to lay out the evidence the government had against defendant. (Tr. 35–37.) Specifically, AUSA Gatz talked about the number of patients defendant saw each day, how defendant was making $12,000 to $20,000 per day, and the potential patients that were willing to testify against defendant. (Tr. 35.) She also mentioned prior employees of defendant who were willing to testify against defendant, and discussed evidence related to several of defendant's patients, including Melinda Brady, David Laffer, and Peluso. (Tr. 35–36.)

After the government presented its evidence to defendant, SA Ricciardi, SA Garcia, and AUSA Gatz left the room, so that defendant could meet privately with his attorneys. (Tr. 39.) After ten to fifteen minutes, Martin emerged from the meeting room and said: "He wants to fold the tent." (*Id.*) Then SA Ricciardi, SA Garcia, and AUSA Gatz went back into the meeting room to discuss a possible plea agreement with defendant and his attorneys. (Tr. 40–41.) Specifically, the government and defendant attempted to agree on a plea agreement that included a certain number of patients and a certain number of pills prescribed. (*Id.*) Defendant nodded his head during these conversations. (Tr. 41.) Everyone in the room agreed to move quickly, and the government told defendant that he could help the government with other investigations by giving the government information about some of his patients. (Tr. 42–43.)

After the meeting ended, SA Ricciardi and SA Garcia brought defendant to the first floor of the courthouse and prepared to drive him back to the jail. (Tr. 43.) Defendant appeared very relaxed, calm, and relieved, as if a weight had been lifted off his shoulders. (*Id.*) On the way to the jail, as they were driving onto the parkway, defendant turned to SA Ricciardi and stated remorsefully: "Hah! I fucked up, Jerry. I did it all for the money. You know, I used to charge $40 in the beginning, and they kept coming and coming, and calling and calling, and I had to charge more and more and more." (Tr. 44.) Defendant added: "I made a lot of money." (*Id.*) SA Ricciardi said nothing to defendant before defendant made these statements. (*Id.*) Later on during the drive, defendant started talking about his children. (*Id.*) SA Ricciardi responded that he had children, as well, and that their children were the same age. (*Id.*) However, SA Ricciardi did not talk at all about defendant's case. [12] (Tr. 44–45.) Finally, before arriving at the jail, defendant volunteered that he helped his patient Melinda Brady by leaving prescriptions for her under the door mat in front of his house, and that she would pay for the prescriptions by leaving money under the mat. (Tr. 45.) Defendant further explained that that he evaluated Melinda Brady's pain over the telephone, and that he did it for reasons of convenience and compassion. (Tr. 45–46.)

B. Admissibility of Defendant's Statements

1. Legal Standard

The Fifth Amendment of the United States Constitution provides, in relevant part, that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Recognizing that a custodial interrogation creates "inherently compelling pressures which work to undermine the individual's will to resist

---

[12] SA Ricciardi testified that he felt no need to ask defendant questions about the case because he believed the case was going to end quickly after the reverse proffer meeting. (Tr. 45.)

15

and to compel him to speak where he would not otherwise do so freely," the Supreme Court held in *Miranda v. Arizona* that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." 384 U.S. 436, 444, 467 (1966). "In particular, prior to the initiation of questioning, [law enforcement] must fully apprise the suspect of the State's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to 'have counsel present . . . if [he] so desires.'" *Moran v. Burbine*, 475 U.S. 412, 420 (1986) (quoting *Miranda*, 384 U.S. at 468–70) (alteration in original). "*Miranda*'s warning requirements, however, apply only to 'custodial interrogation.'" *Georgison v. Donelli*, 588 F.3d 145, 155 (2d Cir. 2009). "This determination has two parts: (a) there must be an interrogation of the defendant, and (b) it must be while she is in 'custody.'" *United States v. FNU LNU*, 653 F.3d 144, 148 (2d Cir. 2011).

The Supreme Court defined interrogation for purposes of *Miranda* in *Rhode Island v. Innis*. *See* 446 U.S. 291, 300–01 (1980). In *Innis*, the Supreme Court held that

> the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.

*Id.* at 300–01. An "incriminating response" is "any response—whether inculpatory or exculpatory—that the prosecution may seek to introduce at trial." *Id.* at 301 n.5. Accordingly, "[w]here statements are spontaneous—that is, where they are not the result of questioning or its functional equivalent—*Miranda* warnings are not necessary and the statements are not protected." *Noble*, 2008 WL 1990707, at *7; *see, e.g.*, *Miranda*, 384 U.S. at 478 ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today."); *Wolfrath v. LaVallee*, 576 F.2d 965, 973 n.6 (2d Cir. 1978) ("[S]ince the statement which was litigated below was a gratuitously volunteered statement, *Miranda* itself is inapplicable, for spontaneous statements which are not the result of 'official interrogation' have never been subject to its strictures.").

2. Application

Although it is undisputed that defendant was in custody when he made the statements at issue, the Court determines that those statements were not the product of interrogation. As is evident from the Court's findings of fact, defendant volunteered these statements absent any question posed by law enforcement agents. Such statements are admissible even though *Miranda* warnings were not provided to defendant on June 22, 2012. *See United States v. Colon*, 835 F.2d 27, 30 (2d Cir. 1987) (defendant's statement was spontaneous, and thus *Miranda* warnings were not required, where defendant "was not questioned, confronted with evidence, or even encouraged to be honest and tell the facts"). Instead, the facts found by the Court show that SA Ricciardi confined his comments to small talk unrelated to

defendant's case. SA Ricciardi's small talk about the weather and his family, for instance, were not reasonably likely to elicit an incriminating response. *See, e.g.*, *Mickey v. Ayers*, 606 F.3d 1223, 1235 (9th Cir. 2010) ("Casual conversation is generally not the type of behavior that police should know is reasonably likely to elicit an incriminating response."); *United States v. Tail*, 459 F.3d 854, 858 (8th Cir. 2006) ("Polite conversation is not the functional equivalent of interrogation."); *United States v. Goist*, 59 F. App'x 757, 763 (6th Cir. 2003) (holding that statements were not the product of interrogation when made during the course of "small talk" between defendant and agent); *United States v. Waybenais*, Criminal No. 12-244 (JRT/LIB), 2013 WL 1881566, at *1 (D. Minn. May 6, 2013) ("[A]n officer need not give *Miranda* warnings prior to engaging in polite conversation with a suspect, as long as the officer does not steer the conversation toward potentially incriminating topics and is not otherwise engaging in conduct that is reasonably likely to result in an incriminating response.").[13]

In sum, the Court concludes that defendant made the statements at issue spontaneously. Because neither SA Ricciardi nor SA Garcia said anything that was reasonably likely to elicit an incriminating response from defendant, *Miranda* warnings were unnecessary, and defendant's statements are admissible. Thus, defendant's motion to suppress is denied.[14]

---

[13] Although defendant bases his motion only on *Miranda* and the Fifth Amendment, the Court has also considered whether law enforcement "deliberately elicited" defendant's statements in violation of defendant's Sixth Amendment right to counsel. *See, e.g.*, *Montejo v. Louisiana*, 556 U.S. 778, 786 (2009) (noting that, "once the adversary judicial process has been initiated, the Sixth Amendment guarantees a defendant the right to have counsel present at all 'critical' stages of the criminal proceedings," and that "[i]nterrogation by the State is such a stage"); *United States v. Rommy*, 506 F.3d 108, 135 (2d Cir. 2007) ("'[T]he Sixth Amendment renders inadmissible in the prosecution's case in chief statements deliberately elicited from a defendant without an express waiver of the right to counsel.'" (quoting *Michigan v. Harvey*, 494 U.S. 344, 348 (1990))). Here, defendant's Sixth Amendment right to counsel attached at arraignment on June 6, 2012. *See, e.g.*, *United States v. Edwards*, 342 F.3d 168, 182 (2d Cir. 2003) ("The Sixth Amendment right to counsel attaches at the initiation of adversary judicial proceedings, such as arraignment or filing of an indictment." (internal quotation marks omitted)); *see also United States v. Moore*, 670 F.3d 222, 234 (2d Cir.) (noting that "arrest on a warrant, even one issued pursuant to a criminal complaint sworn out by prosecutors," does not trigger Sixth Amendment right to counsel), *cert. denied*, 133 S. Ct. 48 (2012). However, because defendant made the statements at issue spontaneously, his Sixth Amendment right to counsel was not violated. *See, e.g.*, *Kuhlmann v. Wilson*, 477 U.S. 436, 459 (1986) (observing that "the Sixth Amendment is not violated whenever—by luck or happenstance—the State obtains incriminating statements from the accused after the right to counsel has attached" (internal citations and quotations marks omitted)); *United States v. Jacques*, 684 F.3d 324, 332 (2d Cir. 2012) (holding that Sixth Amendment right to counsel was not violated where defendant "shared information on his own initiative and on his own terms"), *cert. denied*, 133 S. Ct. 916 (2013); *United States v. Theriault*, No. 07-CR-200 (GLS), 2008 WL 942568, at *3 (N.D.N.Y. Apr. 7, 2008) ("There is no deliberate elicitation if the police passively listen, or if a suspect volunteers statements.").

[14] The government also argues that, even if defendant made the statements at issue during custodial interrogation, the statements are admissible because the government advised defendant of his *Miranda* rights upon his arrest on June 5, 2012 and at arraignment on June 6, 2012, and defendant validly waived his right to remain silent. *See United States v. Banner*, 356 F.3d 478, 480 (2d Cir. 2004) ("It is well established that once an arrested person has received a proper *Miranda* warning, the fact that questioning is stopped and then later resumed does not necessarily give rise to the need for a new warning."), *judgment vacated on other grounds sub nom. Forbes v. United States*, 125 S. Ct. 1010 (2005); *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir. 1975) (holding that defendant validly waived *Miranda* rights by speaking to police after being asked if she remembered her *Miranda*

III. CONCLUSION

For the reasons set forth herein, the defendant's motions to suppress are denied in their entirety.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: March 13, 2014
       Central Islip, NY

\* \* \*

The United States is represented by Loretta E. Lynch, United States Attorney, Eastern District of New York, 271 Cadman Plaza East, Brooklyn, New York 11201, by Catherine M. Mirabile and Lara Treinis Gatz, Assistant United States Attorneys. Defendant is represented by Bruce A. Barket, Barket Marion Epstein & Kearon LLP, 666 Old Country Road, Suite 700, Garden City, New York 11530.

---

rights, which had been recited to her twelve days earlier). At the very least, the government contends, both defense counsel and AUSA Gatz reminded defendant of his right to remain silent at the reverse proffer meeting, and defendant validly waived that right by speaking to SA Ricciardi on their way back to the jail. Defendant responds by insisting that defendant did not validly waive his *Miranda* rights when *Miranda* warnings were administered fifteen days earlier. *See, e.g.*, *United States v. McClain*, No. CRIM. 06-008 (FLW), 2006 WL 2403926, at *4 (D.N.J. Aug. 18, 2006) ("The passage of nearly two weeks between the interrogations and the investigators' failure to remind Defendant of his earlier waivers during the subsequent interview, rendered those earlier waivers stale, and incapable of protecting Defendant's constitutional rights."). Moreover, defendant contends that his Sixth Amendment right to counsel prohibited questioning on the return trip to the jail, because even if defendant had been reminded of his right to remain silent at the reverse proffer session, he had not been reminded of his right to have an attorney present for questioning. *See, e.g.*, *Montejo*, 556 U.S. at 786 ("Our precedents also place beyond doubt that the Sixth Amendment right to counsel may be waived by a defendant, so long as relinquishment of the right is voluntary, knowing, and intelligent. . . . And when a defendant is read his *Miranda* rights (*which include the right to have counsel present during interrogation*) and agrees to waive those rights, that typically does the trick, even though the *Miranda* rights purportedly have their source in the Fifth Amendment." (emphasis added)). Because the Court concludes that defendant volunteered the statements at issue in the absence of interrogation, the Court does not reach these issues.